```
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - - -x
In re:                              :

JOHN R. ROBICHAUD                   :    BK No. 05-11453
          Debtor                              Chapter 7
                                    :
WEBSTER BANK NATIONAL ASSOCIATION   :
          Plaintiff
v.                                  :    A.P. No. 05-1064

JOHN R. ROBICHAUD                   :
          Defendant
- - - - - - - - - - - - - - - - - -x
```

**OPINION AND ORDER DENYING DISCHARGE**

APPEARANCES:

    Peter Furness, Esq.
    Attorney for Plaintiff
    SINAPI FORMISANO & CO.
    100 Midway Place, Suite 1
    Cranston, Rhode Island 02920-5707

    Peter Berman, Esq.
    Attorney for Debtor/Defendant
    RASKIN & BERMAN
    116 East Manning Street
    Providence, Rhode Island 02906

**BEFORE ARTHUR N. VOTOLATO, United States Bankruptcy Judge**

BK No. 05-11453; AP No. 05-1064

Heard on Webster Bank's objection to discharge pursuant to 11 U.S.C. §§ 727(a)(4)(A) and (a)(2)(A), or in the alternative, a ruling that its claim against the Debtor be declared nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) and (a)(4). At the conclusion of the trial Webster dropped its request for Section 523 relief and focused on the § 727 counts.  In his summation, Webster's lawyer gave an accurate and detailed recitation of the evidence and the applicable law, with which the Court agrees in every respect.  Based upon the entire record, and Webster's argument which is adopted and incorporated herein by reference as our findings of fact and conclusions of law,[1] Webster's request to deny discharge under Section 727 is **GRANTED**.

## DISCUSSION

The standard in Section 727 litigation in this Circuit is set out in *Boroff v. Tully* (*In re Tully*), 818 F.2d. 106, 110 (1st Cir. 1987), where Judge Selya wrote:

> Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact. The burden of proof rests with the trustee, *In re Shebel,* 54 B.R. 199, 202 (Bankr.D.Vt.1985), but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." *Matter of Mascolo,* 505 F.2d 274, 276 (1st Cir. 1974).

---

[1] *See In re Mayhew,* 223 B.R. 849, 857, 858 (D.R.I. 1998).

BK No. 05-11453; AP No. 05-1064

    The statute, by its very nature, invokes competing considerations.  On the one hand, bankruptcy is an essentially equitable remedy.  As the Court has said, it is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S. Ct. 274, 277, 17 L. Ed.2d 197 (1966).  In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor.  *Matter of Vickers,* 577 F.2d 683, 687 (10th Cir. 1978); *In re Leichter,* 197 F.2d 955, 959 (3d Cir. 1952), *cert. denied,* 344 U.S. 914, 73 S. Ct. 336, 97 L.Ed. 705 (1953); *Roberts v. W.P. Ford & Son, Inc.,* 169 F.2d 151, 152 (4th Cir. 1948).  "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." *Dilworth v. Boothe,* 69 F.2d 621, 624 (5th Cir. 1934).

    On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs.  The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction.  As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Mascolo,* 505 F.2d at 278.  Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. *See In re Tabibian,* 289 F.2d 793, 797 (2d Cir. 1961); *In re Shebel,* 54 B.R. at 202.  The bankruptcy judge must be deft and evenhanded in calibrating these scales.

*Id*.

The instructions in *Boroff* confirm the conclusion that this is one of the most flagrant cases this Court has seen of a debtor's disregard of the duty to provide truthful, reliable and complete information requested by the Court and creditors.  At least since

2

BK No. 05-11453; AP No. 05-1064

he attended a December 2004 professional consultation regarding bankruptcy, it is clear that Mr. Robichaud was engaged in an ongoing scheme to hinder, delay or defraud his creditors, by repeatedly failing or refusing to provide pre and post-petition creditors (and later the Trustee) with disclosure requests, while the information he did furnish was often false or contradictory.

Although Robichaud's course of deception and dishonesty is fully detailed in the record, and well summarized in the Plaintiff's closing argument, the following examples are worth referencing, vis-a-vis his credibility:

**I.  Robichaud, Stratedge Corp., and Timothy Going**

About five years prior to the filing of this case, Package Technologies was sold to Stratedge Corporation for $6,000,000.  For his 27% interest, Robichaud elected to take 100,000 shares of Stratedge stock (valued at $1,000,000) and $109,000 in cash.  All other Package Technologies' shareholders elected to be paid in cash.  Yet, when Robichaud filed this bankruptcy case in April 2005, he listed his Stratedge stock with the value "unknown."  *See* Schedule B.  As of the filing date, Timothy Going, with whom Robichaud had been in various business relationships since the mid 1990s, was Stratedge's CEO, and the Stratedge Board of Directors consisted of Going, Robichaud, and a third member, Josie Santos. *See* Ex. 16.  Notwithstanding the intimate makeup of the Board,

3

BK No. 05-11453; AP No. 05-1064

Robichaud maintained in his sworn bankruptcy papers that he didn't know the value of his Stratedge stock. This questionable assertion is highlighted by Robichaud's failure to disclose that he served on the Stratedge Board. *See* Statement of Affairs, Question 18. Robichaud further damages his veracity by representing to the Family Court, three months prior to filing bankruptcy, that the same Stratedge stock was worth $11,350. *See* Exhibit 5.

Additionally, on July 14, 2005, less than 3 months post-petition, a release posted on Stratedge's website stated: "all long term debts have been paid, the company is profitable, orders have increased, and the company is achieving nearly 100% on-time delivery. Projections are for an increase in profit in 2005 with an anticipated 35% growth in the work force." *See* Exhibit 7. On the same website are representations that Robichaud was part of a management buyout of Stratedge in July 2003, describing him as "Executive Vice President in charge of Taunton Division Operations and International Sales at Stratedge." Even as the instant matter came to trial, the 2003 press release was still active on the Stratedge website, and from 1994 through 1999 Robichaud referred to himself in various documents as "Vice President" or "Director of International Sales." *See* Exhibit 10. When confronted with these representations, Robichaud stated that Stratedge was not doing well in April 2005 when he filed his bankruptcy case, and that the 2003

BK No. 05-11453; AP No. 05-1064

press release regarding his connections with Stratedge was "inaccurate."

Robichaud's poor grades in reliability are further eroded by other post-bankruptcy events. For example, in March 2006, more than one year post-petition, there was a $275,000 wire transfer from Stratedge to Robichaud's personal checking account, *see* Exhibit 36, Bates Stamp Page 2684, and fourteen days later, Robichaud wired $275,000 to an entity known as Olivenhain Ventures. *Id*. at Bates Stamp Page 2688. Less than two months later there was a similar transfer in May 22, 2006, when Robichaud received $280,000 from Stratedge, and nine days later wired $280,000 to Olivenhain. *Id*. at Bates Stamp Page 2698. Robichaud dismisses these transfers as a way for Stratedge to get money to Olivenhain, the 70% owner of Stratedge, saying that because Going could not loan money directly to Olivenhain, he (Robichaud) merely acted as a disinterested straw in these transfers. These unconvincing explanations leave many more questions than answers, and highlight the struggle creditors have in getting straight answers from Robichaud on any subject.

**II. The Antex/Elecsys Bust-Out.**

In 1996, when Robichaud purchased all of the stock of Antex, Inc. (a microelectronics company that was started in 1969), the company had a worldwide customer base. See Ex. 45. Under

5

BK No. 05-11453; AP No. 05-1064

Robichaud's direction, Antex had its best year in 2000, with $4,500,000 in gross sales. But by 2005, Robichaud was using Antex money to pay many personal expenses, including large cash transfers to his former wife, payments on expensive automobiles, home maintenance, luxury apartment rentals, and other high lifestyle expenses. *See* Exhibit 6. Many of these payments were recorded as "loan(s) to shareholder." In his sworn schedules Robichaud failed to list Antex as a creditor or give any indication that he might owe Antex money, then testified at trial that he did not include the Antex "loans to shareholders" because he didn't know the amount of such loans. Yet, three months prior to his bankruptcy, in a family court filing where, presumably, it was to his advantage to show high personal expenses, Robichaud listed loans from Antex at more than $250,000. Exhibit 5, Bates Stamp Page 173. The transparency of such contradictions exposes Robichaud's reckless disregard of the rights of his creditors, who are entitled to make decisions based on information truthfully provided, and who should not have to scrutinize and independently verify everything he said. *See Boroff,* 818 F.2d 110.

In February 2005, when Robichaud knew the end was near for Antex, he was already having discussions with Tim Going about setting up a new company that would compete directly with Antex. According to Robichaud, he had no connection with the new entity,

BK No. 05-11453; AP No. 05-1064

Elecsys, LLC., other than to "drive Tim Going to a UPS store that would serve as the mailing address for the new company." *See* Exhibit 52. Shortly after Elecsys was formed (February 3, 2005), Robichaud laid off Marie Jerard, who had been Antex's Products Manager for fifteen years, and she was immediately hired by Going (Elecsys), in the same capacity. While Jerard first testified that she took no information when she left Antex, she readily admitted on cross examination that soon after arriving at Elecsys she began contacting Antex vendors and customers. *See* Exhibit 59, Jerard Deposition, pp. 25-27. When confronted with Elecsys invoices paid by her in March 2005, while she was still working at Antex, Jerard had no explanation. *See* Exhibit 21 & Exhibit Ex. 59, pp. 88-97.

On March 31, 2005, just before Antex ceased all operations, Going/Elecsys hired Pamela J. Saathoff, the senior account manager who had also been with Antex for more than 15 years. *See* Exhibit 58, Saathoff Deposition, pp. 13-14. When Saathoff left Antex she brought with her to Elecsys the email contact information for all of Antex's customers. *Id.* at pp. 15-16. This evidence satisfies me that Elecsys was buying inventory from Antex's vendors and doing business with Antex customers even before the "bust out" was complete, all with Robichaud's knowledge and participation.

BK No. 05-11453; AP No. 05-1064

After Antex closed its doors, Robichaud began showing up at Elecsys' premises, but testified at trial that these were merely casual social visits to former *employees*. Both Saathoff and Jerard had a different take on why Robichaud was spending time at Elecsys, i.e., Tim Going told Jerard that Robichaud "would be there to help us in the Providence office if we needed advice on who to go to for a particular product." Saathoff and Jerard also stated that Robichaud was at the office at least three times a week "as a consultant," Exhibit 59, pp. 18-20, that they understood Robichaud was "acting as an assistant to Tim [Going]... to help Elecsys get started," and was there "to help with technical things about purchase orders or electronics that we didn't understand...." Exhibit 58, pp. 50-54. Robichaud insists that he was unemployed after March 31, 2005, but the evidence is all to the contrary. For example, while he allegedly was unemployed, Robichaud's personal bank account shows a deposit of $13,900 in May 2005. *See* Exhibit 36, Bates Stamp Page 2631. Robichaud explained that "this could have been a pay advance" although he had not yet worked a full month for Stratedge, and by August 2005, Robichuad was receiving direct deposits from Stratedge which were recorded as "Mgmt Fee." *Id*. at Bates Stamp Page 2649. Again, Robichaud had no explanation for why Stratedge described such payments as "management fee," or

BK No. 05-11453; AP No. 05-1064

why, when he received $13,200 from Stratedge in January 2006, the entry was recorded as a payment for "Bonds." *Id.* at Bates Stamp Page 2678. Although that transaction was later reversed, there is no doubt that on January 19 his account was credited with the same $13,200. *Id.* Robichaud stated that "he did not own any bonds," does not know why his account was credited with $13,200 by Stratedge, but assures us that the deposit had nothing to do with any business relationship with Elecsys.

The litany of Section 727 violations could go on, but is not necessary for these purposes. Based on the entire record, and in light of Robichaud's many significant credibility problems, Webster Bank's Complaint Objecting to Discharge is **GRANTED**.

Enter judgment consistent with this Opinion.

Dated at Providence, Rhode Island, this     12th     day of September, 2008.

                                              Arthur N. Votolato
                                              U.S. Bankruptcy Judge

Entered on docket: 9/12/2008